UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 4:23 CR 00293 HEA |
| v. | ) | |
| | ) | |
| BRANDON BOSLEY, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING
MEMORANDUM**

Comes now the United States of America, by and through Thomas C. Albus, United States Attorney for the Eastern District of Missouri, and Hal Goldsmith and Matt Martin, Assistant United States Attorneys for the Eastern District of Missouri, and for its Sentencing Memorandum, pursuant to this Court's April 11, 2025 Administrative Order, states to this Honorable Court as follows:

1.      As the Court heard through the substantial evidence presented during trial, this Defendant's criminal conduct was substantial in its planning and implementation.  The United States Sentencing Guidelines here advise a sentence of 12 to 18 months' imprisonment.  Even the high end of that guideline may be inadequately low in achieving the primary purposes of sentencing, which are retribution, deterrence, incapacitation, and rehabilitation, when considering Defendant's conduct as well as his history and characteristics.  It is the position of the United States that anything less than a significant period of imprisonment would ignore the extent of the Defendants' criminal conduct here.  And, of course, it cannot be overlooked that at the time of his criminal conduct Defendant was serving as the elected Alderman for the 3rd Ward of the City of St. Louis, a position that he used in carrying out his criminal scheme.  The

1

citizens of St. Louis, those individuals who follow the rules and who have every right to expect their elected officials to follow those same rules, and whose trust in our system of government has been diminished by the criminal acts of this Defendant and, unfortunately, by many other elected officials in similar positions, deserve some sense of justice here.  That requires the imposition of a fair and just punishment, to include a period of imprisonment.  When considering the factors under 18 U.S.C. § 3553(a), Defendant should suffer a serious consequence for his actions.

2.      First, a preliminary note about the concept of entrapment, a legal term that this Defendant has been bandying about publicly and in court *ad nauseum* since the beginning of this prosecution, without seemingly having any real understanding of its meaning.  As the grand jury found, as the Indictment clearly states, and as the evidence at trial substantially proved, this criminal scheme was instigated, planned, designed, and carried out by Defendant once he was advised by the insurance carrier that there was money to be had for repairs to the damaged Prius automobile.  From his very first conversation with the auto repair shop owner, without any idea of the extent of the necessary repairs, Defendant indicated that he wanted the Prius considered a total loss.  (Government Exhibits 13, 13A)  During their first meeting, Defendant offered the shop owner a $3,000 bribe to inflate the repair estimate.  "…f### that car, man.  You know, mark that motherf###er all the way up.  See what it is that we can do.  I'll throw you a few thousand dollars and f### that insurance company."  (Government Exhibits 14, 14A) "Entrapment is an affirmative defense which consists of two elements:  Government action to induce or otherwise cause the Defendant to commit the crime, and the Defendant's lack of predisposition to commit the crime." *United States v. Pfeffer*, 901 F.2d 654, 656 (8th Cir. 1990). "The Government is not required to prove predisposition unless there is evidence of Government

2

inducement to commit the offense.  To show inducement, there must be evidence of Government conduct creating 'a substantial risk that an undisposed person…would commit the offense." *United States v. Loftus*, 992 F.2d 798 (8th Cir. 1993).  In this case, Defendant's criminal scheme *was initiated by Defendant*, with no inducement whatsoever by the Government and/or the Government's cooperating witness, the shop owner.  In fact, until Defendant advised the shop owner of his scheme, and offered the shop owner a bribe to participate, the Government had absolutely no insight or knowledge that the insurance company had even offered coverage to the Defendant.  This crime was hatched by Defendant all by himself once he saw the opportunity to scam the insurance company.  As the evidence at trial proved, the shop owner followed Defendant's various directions, taking no action without Defendant directing him and approving the action.  And, of course, there is no question that Defendant was predisposed to the criminal scheme, he thought it up all by himself.  Without having actual confirmation, the United States is confident that each of Defendant's successive counsel explained this all to Defendant, including after this Court issued its pretrial Order specifically prohibiting Defendant from attempting to raise entrapment during trial.  Nonetheless, Defendant continued to falsely claim entrapment, even going so far as to broadcast it through a media interview in the middle of trial.  More on that later.  Simply put, based upon Defendant's own actions and conduct, as proven through the substantial evidence presented during trial, there simply was no valid and legal claim of entrapment for Defendant to put forward.  Defendant's continued claims are simply his feeble attempt to convince the public that he was an innocent man, wronged by the Government.  Nothing could be further from the truth.

3.      Title 18, United States Code, § 3553(a) sets out the factors this Court should consider in fashioning an appropriate sentence. The first such factor to be considered is the

3

nature of the offense, 18 U.S.C. 3553(a)(1).  Defendant Brandon Bosley was the elected Alderman for St. Louis City's 3rd Ward from January 2017 through April 18, 2023.  That was the position he held during the period of his criminal scheme here.  In fact, evidence presented at trial revealed that Defendant used his position as an elected official in discussions with representatives of the insurance company, presumably to influence their decision on his claim. This Court will recall from the evidence presented at trial that as soon as Defendant became aware that the insurance company was going to provide coverage he immediately began plotting to obtain a larger payout based upon a series of false repair estimates.  It was as if a lightbulb went off in his head, his scheming began so quickly.  That's a significant aggravating factor this Court should consider, just how quickly Defendant launched his scheme.  Not only does it go to his intent, but it goes to his character as well.    And Defendant immediately recruited and solicited the auto repair shop owner into his scheme, without of course knowledge that the shop owner was cooperating with federal law enforcement on the broader bribery investigation. Defendant was so confident in the success of his scheme that he offered the shop owner a $3,000 bribe to entice him to participate.  Involving another individual in his scheme is another factor this Court should give consideration to, as Defendant's scheme would not have succeeded but for the fact that he recruited someone who he believed would participate and provide the necessary false repair estimates in exchange for a bribe.  Because the shop owner was cooperating with law enforcement, Defendant does not receive a Guideline enhancement for having been a leader or organizer of his criminal scheme.  That is a further aggravating factor not otherwise taken into consideration here.  And, of course, Defendant's scheme involved not one, but two false repair estimates.  Even when the insurance company called foul on the first inflated estimate, Defendant did not cease his criminal conduct but continued to pursue his

4

scheme by directing the shop owner to prepare a second false estimate which the insurance company ultimately accepted as genuine.  Further, this Court will recall that evidence presented at trial revealed that Defendant's scheme went so far as to include his request that the shop owner repurchase the Prius at auction for no more than $2,000 following the insurance payout, and then provide Defendant with an "actual" "true" repair estimate.  Thus, the Defendant would have received the falsely inflated insurance cash payout, and a repaired Prius for significantly less than the total payout. PSR, paragraph 11.  And let's not forget that Defendant had only paid $500 originally for the Prius.  The overall scope of Defendant's scheme is yet another aggravating factor which this Court should consider.

The evidence at trial reflected that the Prius could actually have been repaired for $2,000 to $2,200, but based upon the false repair estimates, Defendant ultimately received $7,978.90 from the insurance company.  While we often presume that a defendant's greed is the motive in this type of fraud scheme, in this case we have proof positive that it's what drove this Defendant to engage in his criminal conduct.  We know from the evidence presented at trial that Defendant had all of $14.93 in his bank account before receiving the insurance payout of $7,978.90. Defendant then basically lived off the insurance proceeds for 6 weeks or so, until he had spent it all, leaving him with a balance of $24.47 in his bank account.  (Government Exhibit 56)  The Court should also consider that, while Defendant was also found guilty by the jury of making false statements to the FBI, under the Guidelines Defendant's Total Offense Level has not been adjusted upward due to the grouping rules.  Thus, another aggravating factor this Court should consider is that the Defendant's Total Offense Level understates the totality of his criminal conduct in that regard.  Defendant's conduct in making false statements to the FBI in a failed attempt to conceal his fraud scheme is serious, and should be considered as an aggravating factor

5

by this Court in determining an appropriate sentence. Finally, it is the position of the United States that Defendant attempted to influence the jury when, following the second day of trial, he went out on the front steps of the courthouse and gave a media interview, declaring for all the world to hear that he had been entrapped, "…oh, it's more than entrapment," and offering criticism of this Court's pretrial rulings and orders by suggesting that "…there's a lot of stuff that they won't allow to come in, and that's real."  Defendant's conduct in this sense was calculated and intentional and reflects Defendant's total disdain for this Court and the rule of law.  It should be considered by this Court in fashioning an appropriate sentence.

4.    The numerous undercover recordings compiled during the federal investigation provide a real and startling view into the corrupt nature of this Defendant's criminal conduct. This case does not present an aberrant view of Defendant, as his own words captured in these recordings, laced with profanity and full of loathing and malice for the insurance company which had done nothing but offer to repair the Prius, reflect his true nature and character.  This case presents a picture of greed, pure and simple, by someone who was elected to serve the people of St. Louis.

5.    This Court is also to consider the history and characteristics of the Defendant in fashioning an appropriate sentence, 18 U.S.C. 3553(a)(1).  Further, this Court can consider *any and all* information concerning Defendant's background and character in determining an appropriate sentence, without any limitation, 18 U.S.C. 3661.  As to this Defendant's history, it is true he has no prior criminal convictions.  However, on December 19, 2025, the Missouri Ethics Commission entered its formal Findings of Fact, Conclusions of Law, and Orders in two separate cases against Defendant (23-0002-A; 23-0004-A).  These Orders found, among other ethical violations, that Defendant had failed to report hundreds and hundreds of improper

6

expenditures for personal expenses made from two separate campaign accounts, during the same period of time that he was engaged in his criminal conduct here.  A review of those Orders reveal that Defendant was, for all intents and purposes, living day to day out of both campaign accounts, spending on personal expenses for everything from gas and groceries to individual meals at fast food restaurants.  Fines of $46,479.00 and $2,956.00 were entered against Defendant in those two cases based upon the multiple counts of violations charged in each.

6.　　　Further as to Defendant's history and character, despite serving as an elected Alderman, sworn to serve the people of the City of St. Louis, Defendant has shown himself to be a racist and an antisemite.  As just one example, on February 10, 2022, while speaking to a local area Black businessman, Defendant made the following racist remarks:

> "My big thing is to help my people.  If there's something you want
> to push in the Ward, then I'm gonna back you.
> There's not one white person that opened up a club in my Ward for
> alcohol since I've been here, and I've not let none of them
> do it.  And that's by design.  If you want to go out here and drink
> or smoke or whatever the f### it is, let us benefit from it.  Period.
> Whatever it is and however that looks like, I want us to win."

Defendant has also shown himself to be an antisemite.  Again, as just one example, on February 10, 2022, while speaking to the auto shop owner, an individual whose family emigrated to the United States from the Middle East, Defendant made the following antisemitic remarks:

> "F### the Jews.  I can tell you're not a Jew, just because of your
> nose.  I don't like Jews.  I'm serious.
> These f###ing bastards, man I f###ing hate the Jews.  We ready
> to f###ing cut these motherf###ers' heads off, boy.
> Kick their asses in the motherf###ing sewer."

Defendant will no doubt submit to this Court any number of letters from family members and friends attesting to his sterling character.  But Defendant's own words,

7

spoken when he was unaware that he was being recorded, give this Court a view into his true character. And in that sense it does not speak well for Defendant.

7. Further, Defendant is approximately $30,000.00 in arrears on paying child support for two of his children, and Defendant has not filed tax returns for the past several years. PSR, paragraphs 46 and 68.

8. This Court's sentence should also afford adequate deterrence to criminal conduct, 18 U.S.C. 3553(a)(2)(B). This Defendant was a duly elected member of the St. Louis Board of Aldermen when he engaged in his criminal conduct. Defendant served on a number of important Aldermanic subcommittees, while also serving his constituents in the 3rd Ward. This Court should fashion a significant punishment not only to deter this Defendant from future criminal conduct, but in order to deter other individuals in similar official positions from committing similar crimes. Unfortunately, there have been a number of elected officials in the St. Louis metropolitan area who have been convicted of public corruption crimes in the past several years. St. Louis County Executive Steve Stenger was sentenced to serve a 46 month sentence for accepting illegal bribes in the form of campaign donations. Missouri State Representative T.D. El Amin was sentenced to serve an 18 month sentence for accepting an illegal bribe. Pine Lawn, Missouri Mayor Sylvester Caldwell was sentenced to serve a 33 month sentence for accepting illegal bribes. Missouri State Representative Courtney Curtis was sentenced to serve a 21 month sentence for stealing campaign funds, and St. Louis Alderman Larry Arnowitz was sentenced to serve an 18 month sentence for similar criminal conduct. Defendant's former colleagues on the St. Louis Board of Aldermen, Lewis Reed, Jeffrey Boyd and John Collins Muhammed, were all sentenced to 46 month sentences for their related bribery and fraud convictions. In the instant case, the United States submits that a prison sentence at the upper end of, or above the applicable

8

sentencing guideline range will have the required deterrent effect.

9.      The United States submits that there is no basis in the law or the underlying facts and circumstances here that would justify a downward variance to a sentence less than the advisory guideline sentence.  It is the United States' position that justice and fairness require  a significant sentence of imprisonment in this case. As a direct result of this Defendant's criminal conduct, the adverse impact upon the City of St. Louis and its residents who rely upon their elected officials to perform their jobs honorably and with integrity has been substantial. This is *not* a victimless crime, as in addition to the citizens of St. Louis the insurance company was also defrauded here.  Our public officials should be held accountable for their criminal conduct while in office by appropriate prison sentences; the citizens deserve it, and fairness and justice require it.

10.     Only a significant prison sentence will adequately reflect the seriousness of the offenses, promote respect for the law, and provide just punishment for Defendant's criminal offenses as is required by 18 U.S.C. 3553(a)(2)(A).

WHEREFORE, the United States of America prays that this Honorable Court sentence Defendant to an appropriate term of imprisonment within the upper end, or above, the advisory

9

guideline range, without a downward variance, and for such other relief as this Court deems appropriate and just under the circumstances.

Respectfully submitted,

THOMAS C. ALBUS
United States attorney

*/s/ Hal Goldsmith*
HAL GOLDSMITH #32984
Assistant United States Attorney
111S. 10th Street, Room 20.331 St. Louis,
Missouri 63102
(314) 539-2200

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2026, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the defendant's counsel of record.

*/s/ Hal Goldsmith*
HALGOLDSMITH
Assistant United States Attorney